THOMAS FITZGERALD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

PETER G. TEN EYCK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 62075, 68197.  Promulgated February 16, 1934.

*John C. Watson, Esq.,* and *Laurence Graves, Esq.,* for the petitioners.

*Frank A. Surine, Esq.,* for the respondent.

#### OPINION.

VAN FOSSAN: These proceedings were brought to redetermine deficiencies of $311.85 for 1929 as to Fitzgerald and of $471.89 for 1930 as to Ten Eyck.

The sole issue is whether or not the salaries of the petitioners, as members of the Albany Port District Commission, are exempt from Federal income tax by reason of its having been received for services in connection with the exercise of an essential governmental function.

On March 25, 1925, the Legislature of the State of New York created a public corporation having perpetual existence, known as the Albany Port District (hereinafter called the District). The act establishing the District provided that the District:

* * * shall embrace the city of Albany and the lands belonging to the city of Albany, within the town of Bethlehem; the city of Rensselaer; and all lands and water, in the Hudson River contiguous thereto, subject to the right, title and interest of the state in and to the lands under the waters of the Hudson River.

The said act also established the Albany Port District Commission (hereinafter called the Commission) to administer the affairs of the District. The Commission is a body corporate and consists of five members, four residents of Albany and one a resident of Rensselaer.

The members are appointed by the Governor of New York upon nomination of the mayor of the city in which the proposed member resides. The governor may reject the nomination made by the mayor. Vacancies in office are filled in the same manner. The term of office is three years and the annual salary is $5,000. Members are required to take the constitutional oath of office. They may be removed by the governor for inefficiency, neglect of duty or misconduct in office.

The Commission is granted the "power and authority over the survey, development, control and operations of Port facilities" in the District and "the co-ordination of the same with existing or future agencies of transportation, with a view to the increase and efficiency of all such facilities and the furtherance of commerce and industries in the district * * *." The Commission was required to make an annual report of its proceedings and deliver a copy thereof to the state superintendent of public works, the state engineer and surveyor, the mayor and common council of each city in the District, the resident United States Army engineer, the Chief of Engineers of the United States Army and the Secretary of Commerce of the United States. An appropriation of $5,000 was made to cover the expenses in connection with the appointment and functioning of the Commission.

The powers and duties of the Commission constituted by the said act, as amended April 5, 1929, are in part as follows:

Sec. 5. Such port commission also shall (1) Have power to confer with the governing bodies of each of the municipalities within the port district and dock, port, harbor, channel and improvement commission and any other body or official having to do with port and harbor facilities within and without the district and hold public hearings as to such facilities.

(2) Have power to confer with the railroad, steamship, warehouse and other officials in the district with reference to the development of transportation facilities in such district and the coordination of the same.

(3) Confer with the proper state officials as to means and measures for stimulating the use of the barge canal.

(4) Formulate and adopt a financial, building and operation program, which shall be submitted to the mayor of each city, in the district, who shall be entitled to be heard thereon before formal adoption, notice of such hearing to be given in writing at least twenty days before the day of such hearing.

(5) Have power to adopt a comprehensive plan, and to change or revise the same, for the development of port facilities in such district, which plan may provide separately for the work of initial development, and shall include an estimate of the total cost of all the work and/or of the work included in such initial development, and to apportion the cost thereof, as provided in section eight, and not oftener than once in three years to revise such apportionment to accord with any changes theretofore made in the comprehensive plan, as required by said section eight; and as part of such comprehensive plan, or pursuant thereto, to determine upon the location, type, size and construction of requisite port facilities, subject, however, to the approval of the secretary of

war and chief of engineers, United States army, where federal statute or regulation requires it.

(6) Have power to acquire, lease, erect, construct, make, equip and maintain port facilities within or outside the district, either on land owned by the district or upon land set aside for its uses and control, as provided in section thirteen, and for any such purpose to acquire and improve real property, including easements therein, lands under water and riparian rights, by agreement or by condemnation, and to sell, rent, exchange or dispose of any property, real or personal, as may seem advisable.

(7) Have power to contract with any municipality in the district for the construction by the municipality of one or more docks, wharves, terminals or warehouses, to belong to the municipality and be maintained by it, whereby a part of the cost of construction shall be borne by the district, in cases where the commission, after a public hearing, determines that such work is of common benefit to the municipalities, inhabitants and property in the district.

(8) Have power to execute contracts within the provisions and limitations of this act and to issue and sell bonds or other obligations of the port district to the amount authorized pursuant to section ten and in such additional amount, not exceeding fifteen per centum of the amount so authorized, as may be required for work included in any revision or amendment of the comprehensive plan, pending a re-apportionment of the total cost as above provided.

(9) Have power to fix rates, charges and wharfage for the use of all port facilities, or to rent the same or grant the use thereof for limited periods, and collect rates, rents, charges and wharfage for such facilities owned or controlled by the district.

(10) Operate and maintain all port facilities owned or controlled by it, including a general terminal railroad connecting with any railroad within said district, use the revenues therefrom for the upkeep thereof and the expenses of the commission and the residue, if any, on hand at the end of any fiscal year, for further construction and port development, or in reduction of taxation.

(11) Have power to regulate and supervise the construction and operation of all port facilities, by whomsoever constructed, installed or owned.

(12) Expend moneys, if any, appropriated by the state for the purposes of this act on account of benefits accruing thereunder to the state or its property.

(13) Have power to create and maintain a traffic bureau.

(14) Have power to employ such clerical, engineering, legal or other professional assistants as it may deem necessary for the purposes of this act, fix their compensation and at pleasure discharge any of them.

(15) Have power to do all things necessary to make the deeper Hudson project useful and productive.

The term "facilities," "port facilities," "terminals," and "terminal work" as used in this act, shall include, among other things, wharves, docks, piers, terminals, railroad tracks on terminals, cold storage and refrigerating plants, warehouses, elevators, and such property real or personal as may be acquired or used in connection therewith, personal service, freight handling machinery and such equipment as is used in the handling of freight and the establishment and operation of a port, and the appurtenances thereto and work of deepening parts of the Hudson river adjacent to the terminal, exclusive of the channel, within the port district.

Sec. 6. The commission may make, and cause to be served upon any municipal or other corporation, or individual, within the district, any reasonable order which it may determine to be necessary for the proper development,

maintenance and use of the port, relating to the construction, equipment, repair, maintenance, use and rental of any dock, wharf, slip, terminal or warehouse owned or leased by such corporation or individual within the district. With a copy of the order shall be served a notice specifying a day, not less than ten days after such service, when such corporation may appear before the commission, present written objections to the making of the order and be heard on such objections. If no such objections be filed within the time stated, or if the order be sustained as the result of such hearing, either in its original or a modified form, such order shall be final, subject only to review by a court of competent jurisdiction; but no order staying or suspending an order of the commission shall be made by any court otherwise than upon notice and after a hearing; and if the order of the commission is suspended, the order suspending the same shall contain a specific finding based upon evidence submitted to the court and identified by reference thereto that great and irreparable damage would otherwise result to the petitioner and specifying the nature of the damage. When an order of the commission shall become final, including the termination of any court proceeding sustaining the order, or of the time for beginning such a proceeding if none be brought, if the corporation or individual shall fail to obey it, or if any municipal or other corporation or individual shall violate a lawful rule of the commission, the commission may commence and maintain an action or proceeding in the name of the Albany port district, in an appropriate court having jurisdiction, for the purpose of having such disobedience to an order or violation of a rule prevented or obedience enforced, either by mandamus or injunction. Such an action or proceeding may be brought in the supreme court, which shall have jurisdiction to grant mandamus or injunction or any other relief appropriate to the case. The commission also, by rule, may prescribe a civil penalty of not more than fifty dollars for disobedience to an order or violation of a rule for any distinct act of such disobedience or violation, or, in the case of a continuing disobedience or violation, a penalty of not more than fifty dollars for each day that it continues. Any such penalty may be sued for and recovered by the commission in any court of competent jurisdiction, and the moneys recovered shall be used in carrying out the provisions of this act. Two or more such penalties incurred by the same corporation or person may be sued for in one action.

Sec. 7. The commission, and any member thereof when directed by the commission, may make any investigation which the commission may deem necessary to enable it effectually to carry out the provisions of this act, and for that purpose the commission, or such member, may take and hear proofs and testimony and compel the attendance of witnesses and the production of books, papers, records and documents, including public records. The commission and its authorized agents may enter upon any lands as in its judgment may be necessary for the purpose of making surveys and examinations to accomplish any purpose authorized by this act, the district being liable for actual damage done.

The petitioners were appointed members of the Commission previous to the taxable years and still hold those offices. They took the oath of office and each received the salary of $5,000 per year. Ten Eyck is chairman of the Commission and devotes practically all his time to the performance of his duties as such member and chairman. Fitzgerald was secretary of the Commission and devoted less time to his duties. The Commission has performed its duties in accordance

with the statutes creating it and has complied with the conditions therein imposed.

Albany is the junction point of the Hudson River, the New York Barge Canal, the Oswego Canal, the Cayuga Canal and the Champlain Canal. It is 143 miles inland from New York Harbor. Within a 250-mile radius of the city the population is equal to one third of the population of the United States. The western terminus of the New York Barge Canal is at Buffalo. The Barge Canal and the Great Lakes afford a continuous waterway of 1,500 miles, serving more people than any other inland waterway in the world.

The Sixty-eighth Congress of the United States appropriated $11,200,000 for the construction of a channel in the Hudson River from New York City to Albany, having a width of 300 feet and a depth of 27 feet at mean low water. Between $8,000,000 and $9,000,000 of that sum was used for the purpose. The State of New York expended approximately $175,000,000 in the construction and improvement of the Barge Canal, formerly the Erie Canal.

Prior to the appropriation by Congress the Chief of Engineers, under date of June 2, 1924, recommended that local interests provide dumping ground for dredged material, " organize an agency to design, construct and operate suitable terminals and to promote the actual transfer of freight between ship and rail at such terminals " and " before any Federal funds are expended on channel improvement, make provision satisfactory to the Chief of Engineers and the Secretary of War for the construction of terminals * * * supporting warehouses * * * a grain elevator * * * and a publicly controlled belt-line railroad * * *." He also stated that credit should be given to the State of New York for its great expenditure in construction of the Barge Canal and for that reason that the locality be relieved from contributing to the cost of the improvement.

During 1930 and prior thereto the Commission was engaged in the construction of the Port of Albany. The following provision contained in chapter 523 of the Law of 1927, amending the original act creating the District, governs the payment of the Commission's expenses:

Annually, in the month of June, the commission shall file with the clerk and with the treasurer of each city in the district, a statement of the amount to be raised upon the territory within such city and paid to the commission, for the estimated expenditures of the commission under this act during such fiscal year, including construction cost, expenses other than for construction, and installments of the district debt, if any, and interest, to fall due in such year. The statement shall specify when the amount should be paid to the commission which shall, so for as practicable, be after the collection of taxes next to be levied in or for such municipality. The clerk of each city shall cause such statement to be presented to the legislative governing body, and board of

estimate, if any, of the city at its next meeting, and such board or body shall cause the amount chargeable to the several parcels of real estate in the city to be levied upon such real estate in the city by the first annual municipal tax levy next occurring, in proportion to the valuation of the taxable real property for city taxes. The amounts chargeable under this section, when collected, shall be paid to the treasurer of the commission. In anticipation of the levy and collection of taxes under this section, the commission may issue and sell certificates of indebtedness of the district, payable for moneys so to be collected by tax in such cities. In determining the total amount to be raised for any fiscal year under this section the commission shall deduct from its estimate of total expenditures the probable amount of net revenues, if any, from its port facilities, and the amount of any appropriations by the legislature to be available in such year.

Each year the Commission submits to the cities of Albany and Rensselaer its estimate of the deficit anticipated in the operation of the port. The salaries of the commissioners are included therein. The amount of the estimate is apportioned between the cities and each includes its respective share in its budget, issues a check therefor to the Commission in a lump sum and levies a general tax assessment against its property owners to cover the amount. The Commission maintains its offices at Albany and has an information office in New York City. Its employees are compelled to contribute to the retirement fund of the State of New York. The commissioners may do so. The Commission makes such contribution in a lump sum for the benefit of its employees.

The Commission has paid for the construction of its port facilities by issuing bonds and certificates of indebtedness. Its bonded indebtedness is $6,036,000 and its outstanding certificates of indebtedness amount approximately to $900,000.

Generally speaking, the Commission's duties are administrative, financial, operative, engineering, and negotiating. The Commission holds hearings on the apportionment of the annual deficit between the cities of Albany and Rensselaer. It arranges for bond issues to provide funds for its constructive work. It formulates plans for the building and expansion of the port. It negotiates with shippers using the port facilities, with municipal, state and Federal officials and with the officers of railroad and steamship lines.

The District is the connecting link between the deeper Hudson project and the Barge Canal. It is the transfer point for export cargoes carried on the Barge Canal from inland shipping points and for import cargoes received by water from the Pacific coast, West Indies, Europe and other points.

The Commission owns the land comprising the port. It consists of 201 acres on the west, or Albany, side of the Hudson River and 110 acres on the east, or Rensselaer, side thereof. Some of the acreage was contributed by the two cities and some was purchased by the

Commission. The facilities and equipment of the port consist of docks aggregating 4,400 feet in length, a belt-line railroad, two transit sheds containing 156,000 feet of floor space, a warehouse 600 feet long, and 180 feet wide, a grain elevator with a capacity of over 13,000,000 bushels of grain—the largest single unit grain elevator in the world—a feed mill, a lumber terminal, and other necessary port and dock equipment such as conveyors, loading devices, turning basin, car-float ferry, stevedoring and fire protection equipment, and water supply. It leases its feed mill to cooperative farm organizations. It also leases land to three stevedoring companies and to the Molasses Products Corporation. These concerns have erected buildings and installed extensive equipment on the properties.

The Commission has adopted certain rules and regulations governing its operations and makes certain fixed charges for the use of its various facilities and equipment. Each year since its creation the Commission has incurred a large deficit. In 1930 the deficit was placed in the budget estimate at $50,000; in 1931, at $65,000; and in 1932, at $228,442.50.

Much has been said and written concerning the exemption from Federal taxation of officers and employees of states and political subdivisions thereof. In the cases before us the status of the petitioners as officers or employees of the state is not challenged. Therefore, we may disregard that phase of the question and confine our discussion to the character of the powers, duties, and activities of the District.

The fundamental rule governing the determination of the Federal taxation is set forth in *Flint* v. *Stone Tracy Co.*, 220 U.S. 107, in the following language:

The cases unite in exemption from Federal taxation the means and instrumentalities employed in carrying on the governmental operations of the State. The exercise of such rights as the establishment of a judiciary, the employment of officers to administer and execute the laws and similar governmental functions can not be taxed by the Federal Government. *The Collector* v. *Day*, 11 Wall. 113; *United States* v. *Railroad Co.*, 17 Wall. 322; *Ambrosini* v. *United States*, 187 U.S. 1.

    *        \*        \*        \*        \*        \*        \*

The true distinction is between the attempted taxation of those operations of the States essential to the execution of its governmental functions, and which the State can only do itself, and those activities which are of a private character. The former, the United States may not interfere with by taxing the agencies of the States in carrying out its purposes; the latter, although regulated by the State, and exercising delegated authority, such as the right of eminent domain, are not removed from the field of legitimate Federal taxation.

We must, therefore, scrutinize carefully the underlying purpose of the creation of the District as reflected by the statutes authorizing it

and also examine the historical background antedating the state and national legislation. For many years the Erie Canal, running roughly east and west across the State of New York, had been in use as a public waterway. Prior to 1925 the State of New York had expended over $175,000,000 in deepening, strengthening, improving and reequipping the canal and had changed its name to "Barge Canal." The state authorities opened negotiations with the Federal authorities for deepening and widening the channel of the Hudson River from Albany to New York City to accommodate sea-going vessels, to the end that a continuous waterway might be established from New York Harbor to the Great Lakes. Three other canals had their terminals at Albany, thus materially enlarging the territory to be served from the Hudson River. The negotiations resulted ultimately in an appropriation of $11,200,000 by Congress for the construction of a channel in the Hudson River 300 feet wide and 27 feet deep at mean low water, but before the appropriation was granted the Chief of Engineers of the United States Army recommended that the state authorities should provide terminals, warehouses, a grain elevator, a belt-line railway, etc., satisfactory to himself and the Secretary of War. He also made the following statement:

* * * The capital district, from the point of view of transportation economies, is a unit whose needs and potentialities transcend those of any individual community contained in it. The Nation's interest lies not in extending deep water to any community as such, but rather in providing a port within the district adequate to serve its hinterland. A suitable site is available at Albany, below the Albany-Greenbush Bridge.

We have noted that on March 25, 1925, the Legislature of the State of New York established the District and designated the Commission to administer its affairs. By the language of the act the commissioners were constituted state officers. The Commission was granted general power and authority over the survey, development, control and operation of the port facilities. The adoption and alteration of its plan of procedure, however, were subject to the approval of the Secretary of War and of the Chief of Engineers of the United States Army. The legislature appropriated from state funds sums deemed necessary to defray the initial expenses. The Commission was also given power to enforce its orders, to make investigations and to proceed in the courts. The annual reports of the Commission were required to be filed with state and national officials. The power was given to and duty imposed upon the Commission to confer with municipal, state and Federal authorities in all matters relating to the development and operation of the port and to its utilization as a thoroughfare for intrastate, interstate, national and international commerce.

As we view the facts, the establishment of the Port of Albany was inspired and impelled by national need. The purpose and use of the port went far beyond the limits of local or sectional requirements. In its inception the project of connecting the Great Lakes with New York Harbor by water was national in its scope. The intent of those advocating it was to build a great system of communication and transportation to aid in the growth of the nation and its economic problem of distribution.

It is equally obvious that the District was not created primarily for the purpose of revenue. The successful launching of such a national undertaking compelled the support of the local cities. There was no thought of profit to them. In fact, there appears to be an increasing yearly deficit arising from the operation of the port. The service charges are fixed at a rate low enough to induce shipments by water. If and when the port shall become self-supporting and shall have reimbursed the cities of Albany and Rensselaer for monies advanced by them, it is reasonable to assume that the rent, wharfage and other charges will be adjusted to maintain that self-supporting basis, but not to produce gain. The primary purpose of the port is to serve the public and not to make money.

Looking more closely to the principal functions of the Commission, we find that they conform to those operations which the Supreme Court, in *Flint* v. *Stone Tracy Co., supra,* classifies as essentially governmental in that the state alone can perform them. The appropriation of $11,200,000 by the Federal Government for the construction of the Hudson River channel was conditioned solely upon the creation of the District and the Commission by the legislative action of the State of New York. The agency so created was an instrumentality of the state. It was a corporate body with perpetual existence. Its members were appointed and conducted themselves as other state officers. It was empowered and directed to confer, treat and cooperate with the Federal Government in order to enable the port to render a maximum service to the public. No private corporation or agency could thus have represented the State of New York.

We are convinced from the facts that the main object of the District and hence, the primary function of the Commission is to provide for the use and benefit of the general public an inland waterway extending from New York Harbor to the Great Lakes; that this vast project has been completed successfully through the joint efforts of the State of New York and the Federal Government; that the Port of Albany is an integral part of that system; that the service charges made by the Commission are necessary but only incidental to the operation of the port; and that, therefore, the compensation

paid to the petitioners as commissioners is exempt from Federal taxation.

The case of *Leon S. Moisseiff*, 21 B.T.A. 515, in which the status of the Delaware River Bridge Joint Commission (of Pennsylvania and New Jersey) and the Port of New York Authority (of New York) was under consideration is basically in point. In that case we stated that "the power of the states to establish public agencies for harbor improvements, for drainage and reclamation purposes, to aid navigation and to provide facilities for commerce is not open to question," our holding being that the agencies named were exercising governmental functions. The Delaware River Bridge Joint Commission was established in Pennsylvania and New Jersey for the purpose of constructing a highway bridge across the Delaware River between Philadelphia, Pennsylvania, and Camden, New Jersey. The Port of New York Authority was created by a compact between the States of New York and New Jersey, consented to by the Congress of the United States. That compact recited that "It is confidently believed that a better co-ordination of the terminal, transportation, and other facilities of commerce in, about and through the Port of New York, will result in great economies, benefiting the nation, as well as the States of New York and New Jersey * * *," and pledged the two States to "* * * faithful cooperation in the future planning and development of the Port of New York, holding in high trust for the benefit of the nation the special blessings and natural advantages thereof." The Port Authority constructed the Arthur Kill Bridges, the Hudson River Bridge and the Kill van Kull Bridge.

In *Leland Powers*, 26 B.T.A. 1381, although we reached a contrary result, in which it is to be noted we have now been reversed by the Circuit Court of Appeals, First Circuit (C.C.H. 1934, No. 9048), we made the following comment respecting the *Moisseiff* case:

* * * In that case, the instrumentalities employed by the States concerned were engaged in providing bridge facilities in furtherance of commerce, and making harbor improvements in aid of navigation, and in so doing did not merely take over and operate a private corporation, as in the instant proceedings. In the case of the States of New York and New Jersey, the legislatures thereof expressly provided that the Port Authority be regarded as performing a governmental function (see page 526) ; the same inference is drawn from the legislation creating the Delaware River Bridge Joint Commission.

In reversing the Board in the *Powers* case the Circuit Court of Appeals stressed the fact that the trustees had power to fix rates and to declare deficits which upon their decision were collected by taxation. Functions and powers comparable to those possessed in both the *Moisseiff* and *Powers* cases were possessed and exercised by the petitioners.

The facts in the cases at bar show that the primary purpose of the District was the establishment and maintenance of a major link in the ocean-to-lake waterway, a development of national importance; that only the state could do the things required to effect such a result; and that, therefore, the Commission was performing essential governmental functions.

The deductions for contributions should be adjusted in accordance with this opinion.

*Decision will be entered under Rule 50.*